IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RYAN W. TALTY, | ) | CASE NO.  1:22-CV-02343-SL |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Ryan Talty ("Plaintiff" or "Talty"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.  § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

In October 2020, Talty filed an application for POD and DIB, alleging a disability onset date of March 30, 2019, and claiming he was disabled due to ankle replacement of the left ankle with 3D printed talus, kyphosis of the upper back, and mental trauma from working physical jobs for decades.  (Transcript

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

("Tr.") 10, 55.)  The application was denied initially and upon reconsideration, and Talty requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 10.)

On November 10, 2021, an ALJ held a hearing, during which Talty, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On December 30, 2021, the ALJ issued a written decision finding Talty was not disabled.  (*Id.* at 10-23.)  The ALJ's decision became final on November 3, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On December 31, 2022, Talty filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 12-13.)  Talty asserts the following assignments of error:

> (1)     The ALJ erred when he failed to properly evaluate the opinion of the treating source, Dr. Glukh in accordance with 20 CFR 404.1520c.

> (2)     The ALJ erroneously failed to comply with Social Security Rulings 03-2p and 16-3p when evaluating Plaintiff's pain and Complex Regional Pain Syndrome.

(Doc. No. 9.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Talty was born in August 1980 and was 41 years-old at the time of his administrative hearing (Tr. 10, 22), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c). He has at least a high school education.  (Tr. 22.)  He has past relevant work as a post office clerk.  (*Id.*)

### B.   Medical Evidence[2]

On May 10, 2018, Talty saw Brian Koludrovich, DPM, for complaints of bilateral heel pain, left worse than right.  (*Id.* at 333, 336.)  Talty reported orthotics and stretching had helped his pain, but the

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Talty challenges only the ALJ's physical findings, the Court further limits its discussion of the medical evidence to Talty's physical impairments.

number of hours he needed to stand on concrete at work still aggravated his pain. (*Id.* at 333.) Talty endorsed post-static dyskinesia, with worse pain on the first weightbearing after periods of rest. (*Id.*) On examination, Dr. Koludrovich found pain to palpation of the medial calcaneal tubercle and central heel, left worse than right, full range of motion of the ankle, low arch height, edema local to the heel, and increased skin temperature of the left heel. (*Id.* at 334.) Dr. Koludrovich discussed the possibility of injections and recommended daily calf stretches, avoidance of going barefoot, and wearing shoes with arch support. (*Id.*) Talty was to follow up as needed. (*Id.*)

On March 7, 2019, Talty saw Nicholas Cambouris, D.C., at the Chiropractic Spine Center for an initial appointment. (*Id.* at 261.) Cambouris noted, "Multiple subluxations were adjusted and noted with spasm, hypomobility and end point tenderness in the cervical, dorsal, lumbar, sacral and pelvic regions." (*Id.*) Cambouris also found active trigger points in the thoracic paraspinal regions. (*Id.*)

On April 2, 2019, Talty saw Dr. Koludrovich for follow up of his left heel pain. (*Id.* at 271.) Talty reported being able to sit more at work, but not completely, and he was having a hard time doing his job because of his heel pain, which was aggravated by his work duties. (*Id.*) Talty told Dr. Koludrovich that since returning to work, which required some standing, walking on cement, lifting, and moving carts, he had experienced worsening of his left heel pain and it was interfering with his ability to work. (*Id.*) On examination, Dr. Koludrovich found pain to palpation of the plantar medial calcaneal tubercle and central heel on the left, full range of motion of the ankle, low arch height, some fullness with tenderness to palpation of the TP tendon inferior to the medial malleolus, edema of the plantar heel, and increased skin temperature of the left heel plantar aspect. (*Id.* at 272.) Talty's diagnoses consisted of chronic plantar fasciitis on the left and TP tendon dysfunction on the left. (*Id.*) Dr. Koludrovich ordered an MRI of the left foot and ankle. (*Id.*)

On June 6, 2019, Talty saw Dr. Koludrovich for follow up. (*Id.* at 291.) Talty reported being off

work had helped his foot and ankle feel much better.  (*Id.*)  Talty told Dr. Koludrovich the pain occurred with weightbearing, especially on hard surfaces such as cement.  (*Id.*)  On examination, Dr. Koludrovich found complete collapse of the MLA with weightbearing, left worse than right, pain to palpation of the anterior medial talor dome, TP tendon and sheath, and plantar medial arch/heel of the left foot, full range of motion of the ankle, mild discomfort to palpation of the TP tendon at the medial malleolus and just distal to that point with resistance to TP muscle testing, mild non-pitting swelling of the left ankle, edema of the plantar heel, and increased skin temperature and modest tenderness of the left heel plantar aspect. (*Id.* at 292.)  Dr. Koludrovich noted an MRI of the left foot revealed "OCD lesion mid plantar medial LT Talus with intra osseous cyst more likely than AVN per report, Ganglionic Cyst from posterior medial talor articulation entering tarsal tunnel, Achilles tendinitis with distal attenuation, TP tendinitis."  (*Id.*) Talty stated he could no longer work at the post office because it required many hours of standing and/or walking a day, and Dr. Koludrovich agreed.  (*Id.*)  Talty planned to take early retirement and have left foot/ankle surgery later that year.  (*Id.*)

On January 20, 2020, Talty saw Cambouris for follow up after an exacerbation.  (*Id.* at 263.) Cambouris noted decreased bilateral muscle strength of the shoulder lateral rotators, shoulder adductors, and hip flexors which was "indicative of subluxation based neurological dysfunction."  (*Id.*)  Cambouris found "episodic marked deterioration of the patient's condition due to acute flareups of the presenting conditions." (*Id.*)

On February 17, 2020, Talty saw Cambouris for follow up.  (*Id.* at 267.)  Cambouris noted, "Multiple subluxations were adjusted and noted with spasm, hypomobility and end point tenderness in the cervical, dorsal, lumbar, sacral and pelvic regions."  (*Id.*)  Cambouris also found active trigger points in the scapular, upper trapezius, and middle trapezius regions.  (*Id.*)  Talty reported feeling better after treatment.  (*Id.*)  Cambouris noted Talty "continue[d] to struggle with pain, discomfort and limitations

4

while at work and performing activities of daily living." (*Id.*)

On April 2, 2020, Vadim Glukh, DPM, noted that the March 17, 2020 Order of the Ohio Department of Health Director Amy Acton, M.D., required cancellation of non-essential surgeries that would use PPE unless special criteria were met. (*Id.* at 273, 275.) Dr. Glukh determined the special criteria were met as there was a threat of permanent dysfunction of an extremity or organ system. (*Id.* at 273.) That same day, Talty underwent surgery for osteochondritis dissecans of left ankle, left ankle pain, bone cyst of ankle, posterior tibial tendinitis of left lower extremity, derangement of left ankle, left foot pain, and tibialis posterior dysfunction. (*Id.* at 403.)

On April 10, 2020, Talty saw Dr. Glukh for his first post-operative appointment. (*Id.* at 274.) Talty reported his pain was diminishing and he requested narcotic use at the time. (*Id.*) Dr. Glukh noted Talty was non-weight bearing and using a knee walker. (*Id.*) On examination, Dr. Glukh found no erythema or drainage of the wound and non-painful passive range of motion of the ankle. (*Id.*) Dr. Glukh noted Talty had done well. (*Id.*) Dr. Glukh did not remove Talty's staples that day. (*Id.*) Dr. Glukh prescribed a one-week course of Percocet, provided range of motion exercises for Talty's ankle, and directed Talty to continue to be non-weightbearing. (*Id.* at 275.) Talty was to follow up in two weeks. (*Id.*)

On April 23, 2020, Talty saw Dr. Glukh for his three-week follow up and reported his pain was diminishing. (*Id.* at 283.) Talty told Dr. Glukh his left great toe joint was swollen and painful and Percocet did not help with the pain. (*Id.*) Talty denied any previous episodes of pain like this and denied a history of gout. (*Id.*) On examination, Dr. Glukh found no erythema or drainage, residual post-operative localized edema in the left lower extremity, a "[s]omewhat edematous 1st MPJ LLE, with minimal erythema and limited ROM," and non-painful passive range of motion of the left ankle. (*Id.*) Talty's diagnoses included gout with manifestations. (*Id.*) Dr. Glukh noted Talty was doing well and that

5

his staples were removed that day.  (*Id.* at 284.)  Dr. Glukh directed Talty to remain non-weightbearing. (*Id.*)

On June 10, 2020, Talty saw Dr. Glukh for his fifth post-operative visit.  (*Id.* at 294.)  Talty reported the pain in his first MPJ area had resolved but the forefoot swelled up often, and he had occasional spasming in his calf/Achilles area and some toe stiffness.  (*Id.*)  Talty did not like to wear shoes or socks when at home.  (*Id.*)  He was "eager to start working out."  (*Id.*)  On examination, Dr. Glukh found use of a knee walker, residual post-operative localized edema on the left, with less edema of the forefoot since the previous visit, and non-painful/smooth range of motion of the left ankle.  (*Id.*)  Dr. Glukh noted Talty had done "very well in general" and recommended Talty gradually phase out the fracture walker.  (*Id.* at 295.)  Dr. Glukh also referred Talty to physical therapy.  (*Id.*)

On October 6, 2020, Talty saw Dr. Glukh for his six-month post-surgical follow up appointment. (*Id.* at 312.)  Talty reported his pain was persisting, mainly in the lateral ankle and dorsal foot areas.  (*Id.*) Talty also told Dr. Glukh he did not tolerate shoes or arch supports on either foot, but especially the left one, and he did not like wearing shoes or even socks at home.  (*Id.*)  Talty reported his 1st MPJ area pain had resolved.  (*Id.*)  Dr. Glukh noted Talty said he was eager to increase his working out.  (*Id.*)  Talty asked about being able to go back to his job at USPS but told Dr. Glukh "he would rather not as he 'hates that place.'"  (*Id.*)  On examination, Dr. Glukh found Talty full weightbearing with a cane or no assistive device and wearing a flip-flop sandal.  (*Id.*)  Dr. Glukh further found localized residual post-operative edema of the left lower extremity, progressively less edematous forefoot than the last visit, and non-painful/smooth passive range of motion.  (*Id.*)  Dr. Glukh noted Talty had done "very well in general" and started him on Flexeril.  (*Id.* at 313.)  Dr. Glukh recommended Talty gradually phase in bicycle riding and low mileage runs, with full weightbearing or weightbearing as tolerated in newly adjusted shoes.  (*Id.*)  Dr. Glukh noted: "Neurology referral was made and patient was advised to see them for chronic pain

6

assessment and possible management.  Hypersensitivity of the foot and heel appear to warrant this referral at this time."  (*Id.*)  Dr. Glukh also referred Talty to PT to "continue to increase conditioning/ROM/balancing/strength in the LLE – as indicated for the recently performed STJ fusion with talus replacement."  (*Id.*)

On October 7, 2020, Talty saw Matthew Kelley, PT, for physical therapy.  (*Id.* at 360.)  Kelley noted Talty continued to have pain and stiffness and that he was scheduled for a neurology consultation regarding his foot pain.  (*Id.*)  Kelley stated, "HE NEEDS BETTER CONSISTENCY WITH PRESCRIBED HEP."  (*Id.*) (emphasis in original).  Talty continued to be limited in walking in the community, negotiating stairs, bending, and lifting heavy objects.  (*Id.*)  Kelley noted Talty was not doing the stretching exercises or calf strengthening exercises; he was just walking.  (*Id.*)  Talty rated his left foot pain as a 4/10 and described it as a spasm and intermittent.  (*Id.* at 361.)

On October 23, 2020, Talty saw Cambouris for treatment of spasticity of the neck muscles and pain in the lumbar spine.  (*Id.* at 574.)  Cambouris found moderate fixation of the spinal joints at L4 and mild joint fixation at C1, C4-5, T4, and T10.  (*Id.*)  On palpation, Cambouris noted mild increased muscle tone in the cervical paraspinal muscles bilaterally, right upper thoracic muscles, lower thoracic muscles bilaterally, and right lumbar paraspinal muscles.  (*Id.*)

On November 23, 2020, Talty saw Joshua Sunshine, M.D., for a new patient evaluation of the pain and hypersensitivity in his foot.  (*Id.* at 558.)  Talty reported three different kinds of left foot pain: (1) cramping pain over the top of his foot when he walks; (2) stabbing pain on the outside lateral aspect of the heel when he walks; and (3) a burning, tingling sensation in his left big toe.  (*Id.*)  Talty denied taking any pain medication.  (*Id.*)  He felt his pain was getting better with time and as he walked on it.  (*Id.*)  Talty told Dr. Sunshine he had noted a purplish color of his skin over the left foot, sensitivity to the touch, and swelling.  (*Id.*)  His foot jerked up from the bed at night about once a month.  (*Id.*)  On examination, Dr.

Sunshine found normal muscle strength, positive allodynia over the top of the left foot, normal coordination, negative Romberg sign, and normal gait. (*Id.* at 559.) Dr. Sunshine diagnosed complex regional pain syndrome type 1 of left lower extremity and prescribed a Medrol Dosepak and Gabapentin. (*Id.*) Dr. Sunshine also ordered an EMG and physical therapy. (*Id.*)

On December 4, 2020, Talty saw Erin Rucinski, PT, for an initial physical therapy evaluation of his complex regional pain syndrome of left lower limb, unspecified abnormalities of gait and mobility, muscle weakness, left ankle stiffness, and left foot pain. (*Id.* at 577.) Talty reported he wanted to improve his ambulation as he was experiencing back pain from compensating. (*Id.*) Talty rated his current pain as a 2/10, with it being a 1/10 at best and a 10/10 at worst. (*Id.*) On examination, Rucinski found reduced range of motion of the left ankle, pain with wincing to palpation of the dorsum of the foot, antalgic gait with mid-foot initial contact, moderate restriction of flexibility on the left, reduced muscle strength of the left lower extremity, increased pronation with decreased arch height in standing, and hypomobility of all left ankle/foot joints. (*Id.* at 578.)

On January 7, 2021, Talty saw Dr. Sunshine for follow up from his EMG. (*Id.* at 598-99.) Talty reported continued "significant discomfort over the left foot." (*Id.* at 598.) Dr. Sunshine noted Talty was unable to complete the entire EMG test due to "excruciating pain"; the needle portion was stopped in the middle. (*Id.*) The EMG revealed evidence of possible nerve damage in his left foot. (*Id.*) On examination, Dr. Sunshine found normal muscle strength, positive allodynia over the top of the left foot, and normal gait. (*Id.* at 599.) Dr. Sunshine stated:

> I am concerned that there is some nerve damage based on the results of the EMG. Further evaluation of this may need to be pursued and the neuromuscular Clinic down at UH for further evaluation and treatment. Further evaluation treatment of the possible CRPS will be per UH. I have given him the name of neuromuscular Clinic down at UH for further evaluation and treatment.

(*Id.*)

On February 19, 2021, Talty saw Dr. Glukh for his twelfth post-operative checkup. (*Id.* at 625.)

8

Talty reported persisting pain, mainly in the lateral retromalleolar left ankle.  (*Id.*)  Talty told Dr. Glukh he usually did not tolerate any shoes or arch supports on both feet, but especially his left foot.  (*Id.*)  Talty stated his pain was "random nowadays."  (*Id.*)  He was "eager to continue to increase his working out."  (*Id.*)  Dr. Glukh noted Talty asked about being able to return to his previous job at USPS, as he would be seated all the time there, but that Talty said he would rather not go back as he "'hates that place.'"  (*Id.*)  Dr. Glukh further noted Talty was ambulating almost limp-free that day.  (*Id.*)  On examination, Dr. Glukh found ambulation with no assistive device and minimal if any limping, residual post-operative localized edema in the left lower extremity, and non-painful/smooth passive range of motion of the left ankle.  (*Id.* at 626.)  Dr. Glukh referred Talty to osteopathic medicine and continued him on Flexeril.  (*Id.*)

On March 26, 2021, Talty saw Zhan Tao Yang, D.O., and Jordan Delgadillo, D.O., for a neuromuscular consult.  (*Id.* at 620, 624.)  Talty reported he needed information to see if he could get disability and wanted to have his leg length assessed, as his chiropractor had done imaging that showed he had a 10 mm leg length difference on the left (short side).  (*Id.* at 621.)  Talty described his back pain as sharp and stiff, and it radiated and caused headaches.  (*Id.*)  Chiropractic treatment alleviated his pain for a few hours, while activity, standing, and sitting aggravated it.  (*Id.*)  Talty rated his pain as a 2/10.  (*Id.*)  Talty also endorsed foot pain and swelling, along with spasms in the top of his foot after standing for long periods of time that caused Achilles tightness and left knee hyperextension.  (*Id.*)  On examination, the doctors found forward head carriage and increased lumbar lordosis, slight short leg on the left when supine, intact gait, and intact strength.  (*Id.* at 623.)  The doctors diagnosed somatic dysfunction and performed osteopathic manipulation.  (*Id.* at 623-24.)

On April 6, 2021, Talty saw Dr. Glukh for his thirteenth post-operative checkup.  (*Id.* at 760.)  Talty continued to report persisting pain, mainly in the lateral retromalleolar left ankle.  (*Id.*)  Talty again told Dr. Glukh he usually did not tolerate any shoes or arch supports on both feet, but especially his left

foot.  (*Id.*)  Talty stated his pain was "random nowadays."  (*Id.*)  He was "eager to continue to increase his working out."  (*Id.*)  Talty reported having tried a 20-mile bicycle run and his foot felt painful afterwards.  (*Id.*)  He told Dr. Glukh he had been doing five mile runs on the stationary bike.  (*Id.*)  Dr. Glukh noted Talty was ambulating almost limp-free that day.  (*Id.*)  On examination, Dr. Glukh found ambulation with no assistive device and minimal if any limping, residual post-operative localized edema in the left lower extremity, "[p]rogessivley LESS Edematous forefoot than the last visit," and non-painful/smooth passive range of motion of the left ankle.  (*Id.*)  Dr. Glukh suggested continuing to gradually phase in low mileage bicycle runs.  (*Id.* at 761.)  Dr. Glukh continued Flexeril and noted Talty reported he never took it.  (*Id.*)  Dr. Glukh also directed Talty to continue to follow up with osteopathic medicine.  (*Id.*)

Imaging of Talty's ankle and back taken on April 23, 2021, revealed evidence of his prior surgery, leg length discrepancy, and scoliosis.  (*Id.* at 1379–82.)

On May 18, 2021, Talty saw Dr. Glukh for follow up and reported his pain was "much better and resolving at this time," although the localized edema in the lateral retromalleolar ankle area persisted.  (*Id.* at 762.)  Talty told Dr. Glukh he had tried to do 25-mile bicycle runs and "did ok."  (*Id.*)  Talty also reported doing runs on the stationary bike as well.  (*Id.*)  On examination, Dr. Glukh found ambulation with no assistive device and minimal if any limping, residual post-operative localized edema in the left lower extremity, "[p]rogessivley LESS Edematous forefoot than the last visit," and non-painful/smooth passive range of motion of the left ankle.  (*Id.*)  Dr. Glukh noted Talty had "done very well in general" and suggested aspercreme or HEET topical for the lateral retromalleolar area.  (*Id.* at 763.)  Dr. Glukh further suggested continuing to gradually phase in low mileage bicycle runs.  (*Id.*)  Talty was to continue to follow up with osteopathic medicine.  (*Id.*)

On July 27, 2021, Talty saw Kelly Campagna, PT, for a physical therapy evaluation.  (*Id.* at 806.)  Campagna noted decreased left ankle range of motion, decreased left ankle strength, and gait abnormality

10

as Talty's impairments.  (*Id.*)  Talty rated his average pain as a 3/10 and described it as aching, burning, sharp, throbbing, and intermittent.  (*Id.* at 807.)  Talty also complained of right knee pain that was a 6/10 on stairs.  (*Id.*)  On examination, Campagna found tenderness to palpation of the posterior left lateral malleolus area, reduced range of motion of the left ankle, and reduced muscle strength (4-4+/5) of the left ankle.  (*Id.* at 808.)

On August 3, 2021, Talty saw Dr. Glukh after he injured his left foot when walking the day before. (*Id.* at 766.)  Talty reported pain, swelling, and feeling like "'something popped.'"  (*Id.*)  On examination. Dr. Glukh found antalgic gait, edema and tenderness of the lateral foot area of the proximal shaft of the fifth metatarsal, and normal range of motion.  (*Id.* at 768.)  X-rays revealed a closed fracture of the fifth metatarsal bone.  (*Id.*)  Dr. Glukh directed Talty to be partially weight bearing on his heel on the left, hold off on any sports and weightbearing exercises, and to wear the fracture walker on the left lower extremity. (*Id.* at 769.)

On September 21, 2021, Talty saw Cambouris for treatment of neck spasms and upper and lower back pain.  (*Id.* at 644.)  Cambouris found moderate fixation of the spinal joints at L4 and a "slight amount" of joint restriction at C1, C4-5, T4, and T10.  (*Id.*)  Cambouris noted testing revealed a mild degree of hypertonicity in the cervical paraspinal muscles bilaterally, right upper thoracic muscles, lower thoracic muscles bilaterally, and right lumbar paraspinal muscles.  (*Id.*)

On September 7, 2021, Talty saw Katrina Rakowsky, D.O., for a neuromuscular evaluation and treatment.  (*Id.* at 790.)  Talty reported continued foot pain but reported he only wore the walking boot when he went out; he walked on his heel at home.  (*Id.* at 792.)  Talty told Dr. Rakowsky his foot still swelled, and he needed to elevate it.  (*Id.*)  He could only stand two to three hours a day.  (*Id.*)  Talty complained of headaches that got worse with sitting.  (*Id.* at 792-93.)  Dr. Rakowsky noted Talty's somatic dysfunction improved with osteopathic treatment.  (*Id.* at 791.)  On examination, Dr. Rakowsky

11

found no spinal tenderness to percussion. (*Id.* at 794.)

On October 7, 2021, Talty saw Dr. Yang for complaints of worsening back pain since he broke the bone in his foot. (*Id.* at 1264.) Talty endorsed upper back pain that radiated to his neck. (*Id.* at 1264-65.) Stretching and OMT helped alleviate his pain. (*Id.* at 1265.) On examination, Dr. Yang found normal muscle tone, no atrophy, no abnormal movements or tremors, increased cervical and lumbar lordosis, and increased thoracic kyphosis. (*Id.* at 1265-66.) Dr. Yang noted Talty's somatic dysfunction improved with osteopathic treatment. (*Id.* at 1264.)

On October 26, 2021, Dr. Glukh completed a Physical Medical Source Statement. (*Id.* at 1304-07.) Talty's diagnosis consisted of left ankle joint derangement status-post replacement, and his prognosis was fair. (*Id.* at 1304.) Talty's symptoms included painful, limited range of motion of the left foot/ankle, and he had chronic left foot/ankle pain that was exacerbated by walking and activity. (*Id.*) Dr. Glukh opined Talty could sit for 60 minutes at one time before needing to get up, and he could stand for 20 minutes before needing to sit down. (*Id.* at 1305.) Talty could stand/walk for less than two hours in an eight-hour workday and he could sit for about four hours in an eight-hour workday. (*Id.*) Dr. Glukh opined Talty would need unscheduled 20–30-minute breaks every 45-60 minutes due to pain, paresthesias, and numbness. (*Id.*) Talty needed to elevate his legs to seat level for 30-40% of the workday because of edema and pain. (*Id.* at 1305-06.) Dr. Glukh opined Talty needed a cane for walking because of occasional pain and insecurity, but he did not need a cane all the time. (*Id.* at 1306.) Talty was capable of low stress work because of his frequent pain and discomfort. (*Id.* at 1306-07.) Dr. Glukh opined Talty would miss more than four days a month because of his impairments or treatment. (*Id.* at 1307.)

**C. State Agency Reports**

On January 7, 2021, Dana Schultz, M.D., reviewed the file and opined Talty could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 60, 62.) His ability to push

12

and/or pull in the upper extremities was unlimited, other than shown for lift and/or carry.  (*Id.* at 60.)  He could push/pull occasionally with his right lower extremity but less than frequently with his left lower extremity.  (*Id.* at 60-61.)  He could stand and/or walk for a total of four hours in an eight-hour workday and sit for about six hours in an eight-hour workday.  (*Id.*)  He could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  (*Id.* at 61.)  He could occasionally kneel.  (*Id.*)  He had an unlimited ability to balance, stoop, crouch, and crawl.  (*Id.*)  He must avoid all exposure to hazards.  (*Id.*)

On April 24, 2021, on reconsideration, Leslie Green, M.D., affirmed Dr. Schultz's findings regarding Talty's ability to lift and/or carry, push and/or pull, stand and/or walk, sit, and climb.  (*Id.* at 70-71.)  Dr. Green opined Talty had an unlimited ability to balance and stoop.  (*Id.* at 70.)  He could occasionally kneel, crouch, and crawl.  (*Id.* at 71.)  Talty must avoid concentrated exposure to extreme cold and vibration and must avoid all exposure to hazards.  (*Id.*)

## D. Hearing Testimony

During the November 10, 2021 hearing, Talty testified to the following:

- He lives with a roommate because he can't afford to live alone.  (*Id.* at 39.)  He does a little on eBay to make as much money as he can, but his doctors kept him from working.  (*Id.*)  He goes to the thrift stores when he can with his foot, and then resells the items at a higher price.  (*Id.* at 40.)  He technically still has his post off job, but his doctors have kept him from going back.  (*Id.*)  He averaged walking 12-15 miles a day as a post office clerk, and it also involved a lot of standing.  (*Id.*)  His foot couldn't handle it.  (*Id.*)  He also had to lift a lot in that job.  (*Id.*)

- He stopped working in March 2019.  (*Id.* at 41.)  He felt a pop in his foot but didn't think much of it and kept working that day.  (*Id.*)  He heard a loud pop in his foot, and it did not hurt much.  (*Id.*)  He went home for the day and when he went to church it was hurting a bit.  (*Id.*)  The next day, his ankle was "killing [him]."  (*Id.*)  The day after that, his ankle was the size of a pumpkin.  (*Id.*)  He saw the foot doctor and got an x-ray, which revealed a cyst and a collapse.  (*Id.*)  He had surgery and they inserted a 3D ankle implant.  (*Id.*)  He was in the process of healing when he reinjured his foot and ended up breaking a bone.  (*Id.* at 41-42.)  He ended up in a boot again until two weeks before the hearing.  (*Id.* at 42.)  His doctor still doesn't want him doing a whole lot.  (*Id.*)

- He told his doctor he tried to go for a 20-mile bike ride in the country, which went all right, but his foot was so swollen he could not walk for three days after.  (*Id.* at 43.)

After that he turned his bike into a stationary bike in the house and rides when he can. (*Id.*)  His doctor told him last week he could start riding again.  (*Id.*)  Yesterday he walked 2,000 steps and today he hasn't really been able to walk.  (*Id.*)

- He doesn't like working at the post office because they don't follow his restrictions. (*Id.* at 44.)  He has not been doing much with his artwork because there have not been many showings since COVID.  (*Id.*)  He is not good at marketing himself, so he needs to pay someone to market it for him, and he does not have enough money to pursue it. (*Id.* at 44-45.)  That would be a job where if his back was hurting or his foot needed to be elevated, he could stop and do so.  (*Id.* at 45.)

- Being in a boot and being sedentary is causing back problems.  (*Id.*)  His back pain keeps him from sitting too much.  (*Id.* at 48.)  He has to lay down a lot to alleviate the back spasms he gets from his hips being uneven from wearing the boot.  (*Id.*)  He has to go to the chiropractor often.  (*Id.*)

- He elevates his foot for at least two hours every day.  (*Id.* at 45.)  He was elevating it during the hearing.  (*Id.*)  His foot swells up no matter what.  (*Id.* at 46.)  He has to elevate three times a day at least.  (*Id.*)  His foot swells if he is sitting, standing, or walking.  (*Id.*)  He must elevate his foot two hours after getting out of bed and it takes two hours for the swelling to go down.  (*Id.*)  If his foot is on the ground a lot, he is elevating his foot every one to two hours.  (*Id.*)  He tries to elevate his foot to heart level.  (*Id.* at 47.)  His doctor did not tell him to elevate his foot to heart level; he looked that up himself.  (*Id.*)  His doctor just told him to elevate his foot.  (*Id.*)  He used a walker from the date of surgery through almost all of last year.  (*Id.*)  He has not really needed it this year, but he has been in a boot.  (*Id.*)

The VE testified Talty had past work as a post office clerk.  (*Id.* at 49.)  The ALJ then posed the following hypothetical question:

> Okay I have two hypothetical questions to ask you.  The first is assume an individual of his age, education, and work experience.  This person is limited to lifting and carrying 20 pounds occasionally ten pounds frequently.  Standing and walking no more than two hours in an eight-hour workday.  No climbing of ladders, ropes, or scaffolds.  Occasionally climbing of ramps and stairs.
>
> Occasional kneeling, crouching, crawling.  This person should avoid concentrated exposure to extreme temperatures, excess vibrations, unprotected heights, avoid all exposure to unprotected heights, moving mechanical parts and commercial driving.  This individual is able to perform simple tasks that follow simple instructions with few if any workplace changes.  Can such an individual with those limitations be able to perform his past work as he performed it?

(*Id.* at 49-50.)

14

The VE testified the hypothetical individual would not be able to perform Talty's past work as a post office clerk. (*Id.* at 50.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as order clerk for food and beverage, telephone quotation clerk, and cutter and paster. (*Id.*)

For the second hypothetical, the ALJ added a limitation that the hypothetical individual would be unable to sit up to six hours in an eight-hour workday without needing to change position, resulting in the individual being off-task for at least 20% of the workday. (*Id.*) The VE testified that such a limitation would be work preclusive as a person needed to be able to sit for six hours to perform sedentary work, and 20% time off-task would be work preclusive. (*Id.* at 50-51.)

Talty's counsel asked the VE what impact the need to elevate one leg to heart level for 30-40% of the workday, in addition to the other restrictions from the ALJ's first hypothetical, would have on the sedentary jobs identified. (*Id.* at 51.) The VE testified a person could not get close enough to their work when elevating their leg that high, so it would be an accommodation and would be work preclusive. (*Id.*)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Talty was insured on his alleged disability onset date, March 30, 2019, and remains insured through June 30, 2025, his date last insured ("DLI"). (Tr. 10.) Therefore, in order to be entitled to POD and DIB, Talty must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2025.

2. The claimant has not engaged in substantial gainful activity since March 30, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: left ankle disorder; left foot disorder; disorders of the spine; depressive disorder; anxiety disorder; and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) except is limited to lifting 20 pounds occasionally, and 10 pounds frequently. Can stand/walk no more than 2 hours in an 8-hour workday. No climbing of ladders, ropes, or scaffolds.  Occasional climbing of ramps and stairs.  Occasional kneeling, crouching, and crawling.  Should avoid concentrated exposure to extreme temperatures, and excess vibrations.  Should avoid all exposure to unprotected heights, moving mechanical parts, and commercial driving.  Is able to perform only simple tasks and follow only simple instructions with few if any workplace changes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August **, 1980, and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined the Social Security Act, from March 30, 2019, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-23.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Talty's Complex Regional Pain Syndrome ("CPRS")

In his second assignment of error, Talty argues that the ALJ "erroneously failed to mention the CPRS and erred when he failed to even mention the relevant Ruling.  Failing to consider the appropriate Ruling which accounted for Plaintiff's continuing complaints of pain and case law in this matter was harmful error necessitating remand."  (Doc. No. 9 at 14.)  Talty maintains that the medical evidence documented allodynia, paresthesias, and swelling in his left lower extremity.  (*Id.*)  Talty argues that while

"the ALJ mentioned pain in his decision (Tr. 16-18), the ALJ failed to account for [his] pain related to his continuing left lower extremity issues compounded by continuing problems with his neck and back." (*Id.* at 17.) Talty asserts that a remand is necessary "to consider the effects of his pain symptoms and that the pain interfered with his ability to perform substantial gainful activity on a full-time and sustained basis." (*Id.* at 18.)

The Commissioner responds, "It is also not essential for the ALJ to discuss SSR 03-2p, as long as he considers the claimant's subjective complaints in a manner consistent with the 'unique characteristics' of CPRS." (Doc. No. 12 at 8) (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 439 (6th Cir. 2017); *Larry P. v. Comm'r of Soc. Sec.*, No. 3:20-CV-807-MGG, 2022 WL 4103351, at *8 (N.D. Ind. Sept. 7, 2022)). The Commissioner admits: (1) "he had symptoms of CPRS as described in the ruling, including allodynia over the top of his left foot, swelling, and possible osteoporosis, along with a tentative diagnosis from the neurologist Dr. Sunshine" and (2) the ALJ did not mention CPRS in the hearing decision. (*Id.* at 9) (citations omitted). However, the Commissioner argues that "it is not the case that the ALJ discounted Plaintiff's pain because it was exaggerated, nor because it was unsupported by objective evidence." (*Id.*) The Commissioner maintains that because the ALJ discussed Talty's foot and ankle problems "at length" in the decision "meant the ALJ agreed that Plaintiff had a medically determinable impairment in his ankle that could have caused disabling-level pain." (*Id.*) (citations omitted). However, the ALJ cited mixed evidence of improvement after Talty's ankle surgery, and the ALJ considered evidence related to Talty's mobility and strength, which were "appropriate findings for the ALJ to consider in assessing Plaintiff's limitations, even if he had CPRS." (*Id.*) (citing *Shepard*, 705 F. App'x at 441).

Talty responds that the Commissioner's arguments are impermissible *post hoc* rationalization. (Doc. No. 13 at 2.)

SSR 03-2p defines CRPS as "a chronic pain syndrome" and explains:

> For purposes of Social Security disability evaluation, RSDS/CRPS can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of the following clinically documented signs in the affected region at any time following the documented precipitant:
>
> • Swelling;
>
> • Autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
>
> • Abnormal hair or nail growth (growth can be either too slow or too fast);
>
> • Osteoporosis; or
>
> • Involuntary movements of the affected region of the initial injury.
>
> When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/CRPS is present and constitutes a medically determinable impairment. It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present.

*Titles II & XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/complex Reg'l Pain Syndrome*, SSR 03-2P, 2003 WL 22399117, at **1, 4 (S.S.A. Oct. 20, 2003).  SSR 03-2p further explains that:

> [c]laims in which the individual alleges RSDS/CRPS are adjudicated using the sequential evaluation process, just as for any other impairment . . . . whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

*Id.* at *6.

21

Here, as the Commissioner admits, there was no discussion of CRPS in the ALJ's decision; therefore, it is impossible for the claimant or the Court to determine whether those symptoms were the basis for the RFC determination by the ALJ. *See Darabed v. Astrue*, Case No. 1:10CV2626, 2011 WL 7456148, at *8 (N.D. Ohio Dec. 6, 2011) ("Here, the ALJ failed to follow SSR 03–2p because although he did discuss Darabed's allegations of pain, he did not even mention, let alone discuss, Darabed's claim of CRPS. . . .[B]ecause the ALJ did not even mention, let alone discuss, Darabed's claim of CRPS, this Court cannot guess as to what material was considered by the ALJ relative to this alleged impairment. Accordingly, application of harmless error in this instance would not be appropriate."), *report and recommendation adopted by* 2012 WL 715863 (N.D. Ohio Mar. 5, 2012). *Cf. Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 439-40 (6th Cir. 2017) (affirming no disability finding where ALJ did not explicitly cite SSR 03-2p but found RSD to be a medically determinable impairment and a severe impairment, and considered the characteristics of RSD in formulating the RFC; therefore, the ALJ "thoroughly considered RSD at each relevant stage of her analysis.")

As the undersigned recommends this matter be remanded on this ground, in the interest of judicial economy, the undersigned declines to reach Talty's additional assignments of error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

Date: October 26, 2023                          *s/ Jonathan Greenberg*
                                               Jonathan D. Greenberg
                                               United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).